**Affirm in part, reverse in part, remand; Opinion Filed December 13, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00566-CV

### ERWIN CRUZ AND THE ERWIN A. CRUZ FAMILY LIMITED PARTNERSHIP, BOTH OF THEM INDIVIDUALLY AND ON BEHALF OF NORTH DALLAS MEDICAL IMAGING, LP, PLANO AMI, LP, AND GHANI MEDICAL INVESTMENTS, INC., Appellants
### V.
### MEHRDAD GHANI, Appellee

**On Appeal from the 101st Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-10-16274**

## MEMORANDUM OPINION ON REHEARING

Before Justices Francis, Myers, and Stoddart
Opinion by Justice Stoddart

We deny appellants' and appellee's motions for rehearing. On the Court's own motion, we withdraw our opinion issued on August 20, 2018 and vacate our judgment of that date. The following is now the opinion of this Court.

This lawsuit involves the interests of two medical imaging centers, North Dallas Medical Imaging, LP ("NDMI") and Plano AMI, LP. Appellant Dr. Erwin Cruz was involved in the formation of both businesses with appellee Mehrdad Ghani. After NDMI was dissolved and Cruz was expelled from Plano AMI, he filed this lawsuit in his own name and on behalf of the Erwin A. Cruz Family Limited Partnership, NDMI, Plano AMI, and Ghani Medical Investments, Inc. (collectively as appellants, "Cruz"). Following a multi-day trial, the jury resolved most questions

in Cruz's favor and awarded actual and punitive damages. The trial court granted Ghani's motion for judgment notwithstanding the verdict ("JNOV") and entered judgment for Ghani on all claims, including his counterclaim. In three primary issues, Cruz argues the trial court erred by entering JNOV because the evidence supports the jury's findings and entitled him to judgment; the trial court erred by entering judgment on Cruz's claim that Ghani improperly paid himself compensation; and the trial court failed to provide due process before entering judgment on Ghani's counterclaim. Cruz also asserts four contingent issues in the event the Court does not find in his favor on his JNOV arguments. In twenty cross-issues, Ghani argues the evidence is insufficient to support several of the jury's answers and many of the jury's answers are against the great weight and preponderance of the evidence. We affirm the trial court's judgment in part and we reverse the trial court's judgment in part. We remand for the trial court to enter judgment in favor of appellants on those portions of the jury's verdict we conclude are supported by the evidence, to consider Cruz's request for equitable relief, and to conduct further proceedings on Ghani's counterclaim.

BACKGROUND

Ghani and Cruz were friends. Ghani owned and operated businesses in the clothing industry and Cruz is a neurologist. They decided to open a medical imaging business, primarily offering MRI scans, in which they would be majority owners. They planned to offer financial incentives to doctors interested in buying into the business. The doctors would refer their patients for medical imaging and receive a share of the proceeds from the business.

## A. Formation of NDMI and Plano AMI

In April 2002, Ghani, Cruz, and Mark Mendes formed NDMI. They each owned a 30.33% limited partner interest. Each partner performed a specific function: Cruz referred his patients for scans and persuaded other doctors to refer patients; Ghani managed the business; and Mendes had

a technical role.  Cruz's office was in the same building as NDMI and he was a primary referral source.  The corporate general partner, MCG Group, Inc. ("MCG"), held a 1% limited partner interest and the remaining 8% was held by physician investors.  Limited partner investors who bought interests in NDMI included Dr. Michael Taba (an orthopedic surgeon), Debra Brown (a physician's assistant), Drs. Robert Ippolito and Henry Raroque, and Adam Hardison (a lawyer).  Taba, Ippolito, and Raroque all referred patients to NDMI.  NDMI borrowed approximately $1.5 million to start the business and Ghani, Cruz, and Mendes personally guaranteed the loan.

Shortly after NDMI opened, Cruz and Mendes had a dispute, which ultimately led to Cruz and Ghani exercising a corporate protection or "bad boy" provision in the limited partnership agreement to expel Mendes from NDMI.  Mendes sued Cruz, Ghani, NDMI, and MCG and they ultimately reached a settlement.  Cruz and Ghani split Mendes's limited partner interest between themselves.

NDMI became profitable and, in 2004, Cruz, Ghani, and Taba created Ghani Medical Investments, Inc. ("GMI") and Plano AMI, LP to operate a second imaging center.  Taba sent most of his patients to Plano AMI because his primary practice was in Plano and he only maintained a small satellite office in Dallas.  At trial, the parties disputed the ownership structure of GMI and Plano AMI.  However, they agreed Cruz, Ghani, and Taba owned equal interests in Plano AMI, directly or indirectly through GMI.

The businesses relied on physicians referring patients for scans and, without such referrals, they were not sustainable.  Ghani testified that as long as the doctors referred patients, they were financially strong.

## B.  Operation and Management of the Centers

Other than a brief period in 2005-2006, Ghani managed the day-to-day operation of both centers.  Taba explained Ghani was to consult Cruz and himself "if there was any issue or anything

else that had to be decided by the three of us." Otherwise, Taba trusted Ghani. Ghani testified: "[B]asically, everybody trusted me and . . . I didn't have anybody to question me."

There were common expenses shared by NDMI and Plano AMI, and Ghani moved money between the two entities. For example, the businesses shared a single software system, which was purchased by NDMI for approximately $100,000; some employees worked for both entities but were on the payroll of only one; and the centers shared a management office. The businesses hired a third-party certified public accountant, Hossein Zamanian, who worked for both entities. One of his employees, Tammy Boynton, testified Ghani determined how to allocate expenses between the entities and NDMI often transferred money to Plano AMI. Boynton believed Ghani used money transfers to even-out income between the partners because NDMI performed better than Plano AMI; she believed Ghani was "trying to redistribute the money so there was enough money there to pay the Plano partners and shareholders." Frequently, at the end of the month, Ghani instructed Boynton to transfer a specific amount of money from NDMI to Plano AMI, but Boynton never saw reports supporting these transfers. Cruz testified Ghani began "running both businesses together," inferring Ghani comingled funds from the two businesses.

## C. Selling the Businesses

In the spring of 2007, Cruz, Taba, and Ghani decided to sell the businesses. They hired a broker, Steve Denn Company & Associates ("Denn"), to market NDMI and Plano AMI to potential buyers. Cruz, Ghani, and Taba decided on an asking price of $5.9 million. Although there were numerous interested potential buyers, including some who provided letters of intent, they did not close a sale. Ghani testified he wanted to sell but, over time, realized this type of business "cannot be sold, because most of the referral[s] . . . come from the investor, and the minute you buy out those investors, they have no incentive to sell the business anymore." Ghani created an impediment for potential buyers by requiring interested parties to pay a $50,000 nonrefundable

earnest money deposit as a condition to examine the businesses' books. Denn considered Ghani's condition, which he had not seen in another transaction, to be an unreasonable barrier that would "scare off everyone."

On July 25, 2008, Denn emailed Ghani and Cruz stating: "I have raised the asking price, based on revenues trending up by !5% [sic] or better as you had told me!" When asked about the email at trial, Denn testified Ghani informed him revenue was up by 15 to 20% so they should raise the asking price.

Denn began finding Ghani increasingly unresponsive when he sought updated financial documents about the businesses. On July 29, 2008, Denn emailed Ghani and Cruz with a list of financial documents he needed and noted he received no response from Zamanian. On August 21, 2008, Denn emailed Cruz because his "calls and emails to Mike Ghani go unanswered." Approximately two weeks later, Ghani unilaterally terminated Denn's contract without consulting Cruz or Taba. Denn forwarded Ghani's termination email to Cruz and Taba, stating: "In my opinion, there is a conflict of interest here. Mike is unwilling to share information, and had [sic] decided on his own, that he does not want to Sell [sic]." Cruz replied: "It has always been obvious [Ghani's] lack of respect and fiduciary responsibilities not to communicate or consider our opinions on these important issues."

## D. Dissolution of NDMI

As 2008 progressed, the relationship between Cruz and Ghani became increasingly tense. In December 2008 or January 2009, a decision was made to dissolve NDMI. The dissolution forms the basis of some of the claims in this lawsuit, and Cruz and Ghani provided the jury with different accounts of what occurred.

### 1. Ghani's Account

Ghani believed NDMI should be dissolved because reimbursement rates from insurance companies were falling, which reduced profitability; key referring physicians, including Taba and Raroque, were relocating and wanted to redeem their partnership shares; NDMI was unable to recruit other physicians to refer business; the MRI machine was nearing the end of its recommended life; and the lease was expiring and the renewal term was five years. Ghani testified he and Cruz agreed it was better to have one thriving business rather than two weak ones. Because their referral base was moving to Plano, they decided to keep the Plano location and close the Dallas one, NDMI.

In September 2008, Ghani stopped making distributions to the NDMI partners. Ghani testified he and Cruz believed this strategy would allow them to "pay the loan very aggressively" in less than a year. From December 2008 until April 2010 when NDMI closed, they used the revenue to pay off debt on which they were personally liable. Ghani stated: "All the decision was [sic] made between Dr. Cruz and I [sic]."

Taba testified Ghani explained the reduced distributions to him as being necessary to pay down NDMI's debt. Ghani told Taba referrals had declined and he believed they would continue to do so, which would adversely impact the financial profitability of NDMI.

### 2. Cruz's Account

Cruz believed NDMI was profitable. However, because Ghani no longer wanted to operate NDMI, Ghani stopped providing Cruz with financial information so that Cruz would believe NDMI faced financial problems and agree to close the businesses. Cruz was concerned that Ghani was misusing his management authority, including comingling money between the businesses. In September 2008, Ghani stopped providing financial reports to him and Cruz did not receive financial reports for September, October, November, or December 2008 even though he requested

them from Ghani and Zamanian. Cruz testified: "So there was no way to get financials to see the veracity, the truth, behind what Mike was saying."

Cruz knew Taba and Raroque intended to reduce their referrals to NDMI, but testified this would impact NDMI "minimally" because the business could recruit other doctors. Cruz attempted to discuss marketing plans and new business strategies with Ghani, but Ghani refused to consider them. Ghani told Cruz: "[I]t's too late. I already committed the machines." Cruz asked Ghani for clarification and Ghani told Cruz he committed to selling NDMI's machines.

When Boynton left her employment with Zamanian on August 30, 2008, she was not concerned about NDMI's financial ability to pay distributions. Although her desk was outside Ghani's office, she did not hear him express any concerns about financial matters. She stated: "He was just saying that he felt that he wanted out of that company because he didn't take it on to do that job for his entire life."

Cruz stated that if he had known the true financial status of NDMI, he would not have agreed to close it. But he believed Ghani who told him "there was no money in 2008. . . that the business was losing money." Ghani asked Cruz to consent to closing NDMI and, eventually after being pressured by Ghani and Doug Brady, a lawyer hired by Ghani, Cruz agreed.

*3. NDMI is Dissolved*

Cruz and Ghani, acting as directors of NDMI's general partner, executed a resolution dated December 5, 2008, authorizing Ghani to oversee the dissolution of NDMI. NDMI continued operating as a business until April 2010, during which time Cruz, Taba, and Raroque continued sending patients to NDMI. Cruz believed the business was busy.

Net revenue for NDMI in 2007 was approximately $1.7 million, it was approximately $1.8 million in 2008 and approximately $1.75 million in 2009. Of those three years, taxable income for NDMI was the highest in 2009. Ghani explained that 2009 numbers were "healthy" because

he reduced expenses by $230,000. He conceded that "if the business is making that kind of an income, you don't close. But that's not the only reason we decided to close down."

### E. Debra Brown Lawsuit

Debra Brown, a physician's assistant who was a limited partner in NDMI, sued Ghani, Taba, and Cruz in August 2009 for breach of contract and breach of fiduciary duty. Brown believed Ghani did not disclose relevant information and there "was no transparency." Brown testified Ghani stopped paying her distributions from NDMI in September 2008 without providing an explanation even though NDMI was profitable. She alleged NDMI was mismanaged and money was improperly moved from NDMI to Plano AMI.

In December 2008, Brown began communicating with Adam Hardison, another NDMI limited partner and a lawyer. During discovery in the Brown lawsuit, Brown produced documents showing Cruz sent approximately ninety-five emails to Hardison in September 2008 (before Brown filed her lawsuit), which included tax returns from NDMI and Plano AMI. Hardison and Brown were not limited partners in Plano AMI and were not entitled to financial information about the entity. Cruz acknowledged he shared the information with Hardison and explained he sought legal consultation from Hardison as part of selling the businesses through Denn.

Ghani, Cruz, and Taba hired a lawyer, Shawn Tuma, to represent them in Brown's lawsuit. Ghani asked Tuma to convene a meeting in Tuma's office. Ghani was "extremely upset" at the meeting and stated he discovered emails showing Cruz was communicating with Brown "behind the scenes." According to Cruz, during the meeting, Ghani threatened him, saying: "Dr. Cruz, you are a traitor. You're a traitor, and I'm going to hire my attorneys. I'm going to destroy you, and I'm going to take your license away." Cruz then left the meeting. Taba felt betrayed by Cruz's actions and said it was "dishonest[], disloyal toward the rest of the partners." After the meeting in Tuma's office, Taba and Ghani consulted with Doug Brady about removing Cruz from Plano AMI

and GMI. Ghani believed removing Cruz was necessary because Cruz shared confidential information about Plano AMI with Debra Brown and Adam Hardison.

## F. Plano Open

In 2007 or 2008, Cruz, Ghani, and Taba discussed acquiring an open MRI machine to create an additional revenue stream for Plano AMI. Although Plano AMI could have acquired an open MRI machine, Ghani and Taba created new two new entities in January 2010: Plano Open MRI, LP and its general partner Ghani Medical Investment #2, LLC. Taba testified Ghani made the decision to create new entities rather than extending Plano AMI or GMI, but they planned to eventually "bring[] all the limiteds on board with an open." Cruz was not invited to join or informed about the venture. In May 2010, Taba apologized to Cruz for not including him and said: "Look, Mr. Ghani had said he doesn't want to [do] any business with you and you had said you don't want to do any business with him." Taba testified it was impossible for Ghani and Cruz to form another business venture together.

Plano Open was located across the parking lot from Plano AMI, and Ghani managed both entities. When Plano Open began operating, Taba's referrals to Plano AMI declined. Plano Open was profitable and, because the open MRI machine was not expensive, margins were high. In the first year, Ghani and Taba made over $100,000 each in profit.

Cruz asserts Ghani breached his fiduciary duties to Plano AMI and GMI by pursuing Plano Open. Ghani testified he discussed Plano Open with attorney Doug Brady who looked at the partnership documents and told him he could pursue Plano Open.

## G. Jury Verdict and JNOV

The jury returned a verdict nearly entirely favorable to Cruz. It determined Ghani failed to comply with his fiduciary duties to NDMI with respect to the dissolution, that failure was not excused, and it damaged NDMI. The jury likewise concluded Ghani breached his fiduciary duties

to Plano AMI and GMI with respect to the pursuit of Plano Open, those breaches were not excused, and they caused damages. The jury found Cruz was a limited partner in Plano AMI; Ghani directed or participated in GMI's conversion of Cruz's shares in Plano AMI and GMI[1]; and Cruz suffered damages.

Ghani filed a motion for JNOV challenging most of the jury's findings. The trial court granted the motion in its entirety and entered judgment favorable to Ghani. This appeal followed.

LAW & ANALYSIS

In his first issue, Cruz argues the trial court erred by granting Ghani's motion for JNOV because the evidence supports the jury's findings and entitles him to judgment. In twenty cross-issues, Ghani argues the evidence is insufficient to support several of the jury's answers and many of the jury's answers are against the great weight and preponderance of the evidence.

A. Standard of Review

We review a trial court's decision to grant JNOV under a no–evidence standard, examining whether any evidence supports the jury's findings. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (test for legal sufficiency is same for summary judgment, directed verdict, JNOV, and appellate no–evidence review). No evidence exists when there is:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of a vital fact.

*Gharda USA, Inc.*, 464 S.W.3d at 347 (quoting *City of Keller*, 168 S.W.3d at 810). We uphold the jury's finding if more than a scintilla of competent evidence supports it. *Id.* More than a scintilla of evidence exists when the evidence supporting the finding "rises to a level that would enable

---

[1] The conversion of Cruz's interests in Plano AMI and GMI are discussed below.

reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). We review only the evidence tending to support the jury's verdict and "must disregard all evidence to the contrary." *Id.* (quoting *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990)). We consider the evidence and possible inferences in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.*; *City of Keller*, 168 S.W.3d at 822. When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

When a party complains about the factual sufficiency of the evidence, it must show the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242; *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 722 (Tex. App.—Dallas 2011, pet. denied). We consider and weigh all of the evidence and set aside the verdict only if the supporting evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem.*, 46 S.W.3d at 242; *PopCap Games*, 350 S.W.3d at 722.

We measure the sufficiency of the evidence by the jury charge as it was submitted. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005). When conducting our review of both legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Wash Techs. of Am. Corp. v. Pappas*, No. 05-16-00633-CV, 2018 WL 718550, at *5 (Tex. App.—Dallas Feb. 6, 2018, pet. denied) (mem. op.). The jury is free to believe some, all, or none of a witness's testimony. *Pappas*, 2018 WL 718550, at *5. We may not substitute our judgment for that of the fact finder's. *Id.*

–11–

**B. NDMI Claim**

The jury found Ghani failed to comply with his fiduciary duties to NDMI with respect to the dissolution of NDMI and that failure was not excused. The trial court granted Ghani's motion for JNOV as to these findings. In his first issue, Cruz argues, in part, the trial court erred by entering JNOV on his NDMI claim. In his first and third cross-issues, Ghani asserts the evidence is insufficient to support the jury's answers to Questions 1 and 3, respectively, and in his second cross-issue, he argues the jury's answer to Question 2 is against the great weight and preponderance of the evidence.

*1. Jury Charge, Jury's Findings, and JNOV*

Question 1 of the jury charge states MCG owed fiduciary duties as the general partner of NDMI. To the extent Ghani exercised a degree of control over MCG such that he directed MCG's conduct as the general partner regarding the dissolution of NDMI, Ghani owed fiduciary duties to NDMI. To show Ghani failed to comply with his fiduciary duties to NDMI, Cruz was required to show:

    a. The dissolution transaction was not fair and equitable to NDMI;
    b. Ghani did not make reasonable use of the confidence that NDMI placed in him;
    c. Ghani did not act in the utmost good faith or exercise the most scrupulous honesty toward NDMI;
    d. Ghani placed his own interests before the interests of NDMI, used the advantage of his position to gain a benefit for himself at the expense of NDMI, or placed himself in any position where his self-interest might conflict with his obligations to NDMI; or
    e. Ghani failed to fully and fairly disclose all important information to NDMI.

The jury answered "yes," finding Ghani failed to comply with his fiduciary duties to NDMI with respect to the dissolution.

In Questions 2 and 3, the jury determined Cruz did not waive Ghani's failure to comply with his fiduciary duties and $2.075 million would fairly and reasonably compensate NDMI for the damages caused by Ghani's breach of fiduciary duty. Ghani moved for JNOV on the grounds

–12–

there is no evidence to support the jury's answer to Question 1, the jury's answer to Question 2 should be disregarded because he established waiver as a matter of law, and there is no evidence to support the jury's answer to Question 3 awarding damages. Ghani's motion for JNOV did not challenge that he owed fiduciary duties to NDMI.

### 2. *Background Facts*

Evidence, including Ghani's own testimony, shows Ghani exercised control over NDMI and directed the day-to-day operations. Ghani explained NDMI needed to be closed because the referral stream from doctors was declining and not being replaced, Ghani and Cruz were personally liable for debt on the equipment, and insurance reimbursement rates were dropping. However, ample evidence shows NDMI was not facing a financial crisis and could have continued operating successfully, but Ghani wanted to end his partnership with Cruz. There is evidence showing Ghani withheld financial information while misrepresenting the status of NDMI to induce Cruz to agree to close NDMI.

### a. **Access to Financial Data**

Ghani and Cruz presented contradictory evidence about whether Cruz had access NDMI's complete financial data before he agreed to the dissolution.

#### i. *GHANI'S EVIDENCE*

NDMI's financial information was maintained on a computer using the software QuickBooks. Zamanian testified the computer was maintained in NDMI's office and approximately twenty to thirty steps outside of Cruz's personal office. Ghani explained one of the reasons they employed Zamanian, a third-party CPA, was to provide all partners access to financial information. Cruz and Taba also used Zamanian for personal tax returns and had relationships with him. Ghani stated that "everybody felt comfortable with him."

–13–

According to Ghani, in August or September 2008, Cruz began complaining about access to financial information even though he "always had access" through Zamanian and Tammy Boynton. Ghani testified: "I never sent [Cruz] any financials, because I didn't want to be responsible for that financial [sic]. That's why we had the CPA. . . . So we had all the same source where we get our information from." Ghani testified that in late 2008 he sent an email to Zamanian (copying Cruz) stating Cruz was entitled to all financial information and Zamanian needed to make sure Cruz had what he needed. The email was not shown at trial.

Boynton testified that while she worked for Zamanian, she provided Cruz with any financial information he requested about NDMI and Plano AMI, but she did not believe Cruz reviewed it. Zamanian and Ghani knew she provided this information. Before she stopped working for Zamanian in August 2008, she gave CDs containing backup copies of QuickBooks records for the businesses to Cruz.

Taba testified the financial information "was always there to be looked at, if someone wanted to look at it" and the information was always available through Ghani or Zamanian. Zamanian testified financial information was timely provided to any client who requested it, "especially for someone who is so close to me. His office was next door to me. How could I not do this?"

ii. *CRUZ'S EVIDENCE*

Cruz testified he stopped receiving financial information about the businesses in September 2008 when Boynton stopped working for Zamanian. Taba also testified that although Ghani provided "all the documents" to Cruz and himself when the business started, he stopped doing so in later years. On January 5, 2009, Cruz emailed Taba asking if Taba received his Schedule K-1, a tax document, or "financial [sic] for 2008." Cruz's email states he left a multitude of messages for Zamanian, but did not receive any response. He stated "[i]t is like hitting a wall." Taba replied

he had not. When asked whether a person could expect to receive a Schedule K-1 by January 5, Zamanian replied "absolutely not" because the entire year's financial data must be compiled before a Schedule K-1 can issue and, at best, that would not be finished before the end of January. Zamanian testified the Schedule K-1 usually issued in the summer.

On April 3, 2009, Cruz emailed Zamanian and Ghani "requesting again the detailed financial reports of Plano and Dallas MRI business, P and L and everything you agreed to provide me this past Monday." Cruz testified he was concerned about the financial status of the partnerships. When asked about the same email, Zamanian stated he provided all information and did not know what Cruz was seeking. Zamanian recalled an instance when he had to deliver the same information to Cruz's office two or three times. Cruz emailed Zamanian and Ghani again on April 16, 2009 stating: "Despite multiple verbal and written communications, you both have decided not to give me the information I requested for my tax return. Because of that I have to request an extension. You both have provided me with partial information which has not helped me at all. My K-1s do not match my records and I am at an impasse. As a general partner I have the right to have such documents. I should not even have to ask for them." Although Cruz testified he needed tax information and he was trying to determine how Ghani spent money, Zamanian believed this information was provided to Cruz.

On July 2, 2009, Doug Brady wrote a letter on Cruz's behalf to Ghani and Zamanian requesting numerous financial reports for NDMI and Plano AMI. The letter states Cruz, a limited partner, is entitled to the information. Cruz testified that when this letter was sent, he had not received financials for nearly one year.

Kimberly Ault Robinson worked for NDMI in the summer of 2008. When asked whether Ghani instructed her not to share information with Cruz, she answered affirmatively and explained: "[I]t was a very broad instruction. It was to never discuss anything that I heard in any of the

–15–

facilities regarding business to Dr. Cruz. If I were to go in his office and market to him or check on how referrals were, I was just not to talk or discuss anything business related with Dr. Cruz. . . . it was very vague. There was some talks about that the Dallas location was going to close down and the partners were not going to ask Dr. Cruz to go to the new investment. They were doing it hush-hush without his knowledge."

William Meier, an attorney who drafted some documents for NDMI, testified that several NDMI limited partners voiced concerns about the lack of timely information from Ghani. Cruz frequently called Meier and complained he was not receiving access to basic information about NDMI. During board meetings, Meier, Cruz, and Ghani discussed that Ghani needed to be more transparent and make information available to Cruz so he could have meaningful input as a member of the board.

Adam Hardison, a lawyer and NDMI limited partner, testified Ghani did not provide sufficient financial information. On September 3, 2008, Hardison sent a letter to Ghani to force Ghani "to be transparent to the partners, to comply with the fiduciary duty that we all have, to provide this information to potential buyers, and why it's not happening." The letter requested Ghani provide numerous pieces of information about NDMI.

While the evidence shows that until approximately September 1, 2008, Cruz had ready access to financial data through Zamanian and Boynton, some evidence, including Cruz's testimony, indicates access to financial information stopped once Boynton left Zamanian's employment. Additionally, although the decision to dissolve NDMI was made in December 2008 or January 2009, evidence shows Cruz's difficulty obtaining financial information continued into 2009. Cruz's assertion that it was difficult to obtain financial information from Ghani and Zamanian was confirmed by Denn's, Hardison's, and Meier's testimony.

b. **NDMI Financially Sound**

Scott Hakala, Ph.D., testified as Cruz's damages expert. Hakala works for a firm that values businesses and business interests. To value NDMI, he focused on the "market approach" to valuation, meaning he looked at how much a buyer would pay for the business based on its present value. The first step in performing the analysis is to identify the value of similar businesses in the market. He looks for transactions involving companies of similar size and type to determine which multiple of earnings, multiple of revenue, or other measure that the businesses are being bought and sold for. Hakala testified the market for MRI centers was active from 2005 through 2012. It was a "very active acquisition market" with private groups looking to buy imaging practices of "a certain size and type and profitability, and they were paying a certain known rate for those businesses."

He noted there were several indications of interest or offers to purchase NDMI along with Plano AMI. He testified: "we had a number of offers that we could look at and see what people were offering and then compare that with what we were seeing in reported general stories of what these firms were being bought, as well as specific identifiable transactions." He considered the offers "conservative but reasonable offers consistent with what we were seeing in the imaging business." He testified acquiring companies were generally paying "somewhere between three and six, sometimes a little more than six times EBITDA,[2] so they would look at EBITDA as their primary focus."

When determining which EBITDA multiple to use, one consideration is the life of the MRI machine. If the machine is nearing the end of its useable life, then the multiple is lower because a buyer will need to retrofit the existing machine or purchase a new unit. However, if the MRI machine has more than half its life remaining and the practice is still growing, a buyer may pay

---

[2] EBITDA is an acronym for the calculation of earnings before interest, taxes, depreciation, and amortization.

four or five times EBITDA. Other considerations are the referral base and the extent a buyer thinks it could expand that base and the level of competition among MRI service providers in the area. Hakala looked at the referral base for NDMI and its historic performance from the time of its inception until the date he valued the business. He also examined tax returns, portions of the general ledger in QuickBooks, partnership and organizational documents, and deposition transcripts of "various individuals" taken during the litigation to ensure he understood how the business operated as well as its "unique factors."

Hakala opined NDMI would fall in the "lower middle part" of the EBITDA multiplier range. He testified it had a "good base of revenue, a good history, a good trend, but they appeared to have . . . basically leveled out." The machines would be good for four and a half to five years. On the conservative side, he estimated "about four times EBITDA was about what we would typically expect NDMI to be sold for."

Hakala attempted to determine annual earnings for NDMI by analyzing historical financial statements. An exhibit used during his testimony shows:

**NDMI Tax Return and Adjusted Financial Statements**

|  | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|---|---|---|---|
| Net Revenue | $ 422,761 | $ 1,747,645 | $ 1,779,761 | $ 1,717,099 | $ 2,115,386 | $ 1,984,349 | $ 1,995,960 | $ 1,460,593 | $ 24,762 |
| Gross Profits | $ 314,828 | $ 1,282,806 | $ 1,358,686 | $ 1,213,819 | $ 1,493,668 | $ 1,384,371 | $ 1,530,413 | $ 1,106,981 | $ 24,762 |
| Other Income | $ 32,212 | $ - | $ - | $ 217,159 | $ 152,263 | $ 165,432 | $ 104 | $ 22,028 | $ - |
| Expenses | $ 359,985 | $ 719,081 | $ 954,461 | $ 1,073,846 | $ 1,058,588 | $ 968,164 | $ 962,649 | $ 1,103,622 | $ 189,710 |
| Taxable Income | $ (12,944) | $ 563,725 | $ 404,225 | $ 357,132 | $ 587,343 | $ 581,639 | $ 567,868 | $ 25,387 | $ (164,948) |
| EBIT | $ (9,877) | $ 588,559 | $ 448,971 | $ 426,605 | $ 673,469 | $ 667,323 | $ 631,862 | $ 94,466 | $ (164,948) |
| EBITDA | $ (9,877) | $ 695,911 | $ 626,352 | $ 650,542 | $ 942,361 | $ 930,192 | $ 963,425 | $ 507,692 | $ (41,910) |

Hakala explained net revenue declined for NDMI from 2006 to 2007 because the MRI reimbursement rates were reduced. Net revenue from 2007 through 2009 was stable. It fell again in 2010, which Hakala attributed to NDMI closing its operation in early 2010. The EBITDA, which Hakala testified is a "pretty good measure of the true profitability of the business," also fell from 2006 to 2007 but remained relatively stable in 2007, 2008, and 2009, increasing slightly from

2008 to 2009. Once Hakala had these numbers, he conducted a "normalizing process" to show how much profit the business actually generated.

Hakala testified that at the end of 2008, the owners could have sold NDMI for approximately $3.5 million. Once the net debt of $561,773 was subtracted, the equity value of NDMI at the end of 2008 was about $2.95 million. Based on his calculations, Hakala did not believe the decision to dissolve NDMI was justified. NDMI's value was not maximized by dissolving the business and, unless the business was sold, a better strategy would have been to continue operating until it became unprofitable to do so.

When asked whether doctors referring fewer patients to NDMI would affect the future financial viability of NDMI, Hakala testified: "Some, but not that much." The potential for reduced referrals was one of the reasons he used a lower multiplier range for NDMI. Looking at the net revenue numbers for NDMI in 2008 and 2009, Hakala stated NDMI was not teetering on the "brink of financial viability." He believed NDMI "would probably have to lose half or more of its revenue before you can really start seeing it get to a negative EBITDA where you'd no longer continue to try and operate it."

Hakala also used an income-valuation approach to value NDMI, which produced a value about 30 to 50 percent higher. Hakala testified: "Basically, you get more value if you continue to own and run it than if you try and sell it to somebody else, because they're going to discount it for the risks." Generally, he explained, the value to the existing owner is higher than to a potential buyer in the MRI business.

### c. Ghani motivated to close NDMI

Some evidence shows Ghani no longer wanted to operate NDMI and was entering into a new MRI business venture that did not include Cruz. Kimberly Ault Robinson, a former employee, testified: "There was some talks [sic] about that the Dallas location was going to close down and

the partners were not going to ask Dr. Cruz to go to the new investment. They were doing it hush-hush without his knowledge." Boynton stated Ghani "was just saying that he felt that he wanted out of that company because he didn't take it on to do that job for his entire life."

Additionally, in December 2008, Ghani formed a new business venture, Mesquite AMI, with his friend Reza Nabavi. Cruz testified Ghani created Mesquite AMI at the same time he sought to close NDMI by telling Cruz: "We've got to close. There is no money, no business going on." When Cruz wanted to discuss marketing plans for NDMI so the business would not need to close, Ghani told Cruz: "[I]t's too late. I already committed the machines." Cruz asked Ghani for clarification, and Ghani told Cruz he committed to selling NDMI's machines. Cruz testified: "And that's the exact time he was in the business, or he's registered this business with our machines."

NDMI eventually closed in April 2010 and Nabavi came to NDMI to collect the MRI machine. Nabavi told Cruz he was going into business with "Mike." The record includes a service price quote given to "SASAN, Ltd. or assignee Reza Nabavi, Partner" and made to the attention of Mike Ghani to de-install an MRI machine located in Dallas and re-install it at a location within 20 miles. The date on the invoice is April 23, 2010.

Ghani testified Cruz gave him authority to sell all of the equipment. Nabavi was interested in buying the MRI machine and offered to pay more than any other potential buyers. Nabavi bought the machine and opened a business that Ghani is not part of. The Mesquite AMI proposal never came to fruition. Ghani denied he planned to open an MRI facility with Nabavi in 2010.

*3. Analysis of NDMI Claim*

Although Ghani provided an explanation about why NDMI needed to be dissolved and why the dissolution was not a breach of his fiduciary duties, evidence presented at trial allowed jurors to reach the opposite conclusion. Some evidence shows Ghani withheld financial information from Cruz immediately before seeking Cruz's consent to close the business. That

information would have shown NDMI was not in financial straits and could continue operating as a profitable entity. Although Ghani stated the financial problems were due, in part, to declining reimbursement rates, Hakala testified that occurred in 2006-2007 and the businesses had recovered financially. Further, although Ghani asserted referrals were declining because Taba and Raroque were moving their practices away from Dallas, Hakala testified a change would have "some, but not that much" impact on future financial viability and Cruz stated the impact would be minimal.

A jury could reasonably infer that Ghani acted as he did because he no longer wanted to be in business with Cruz and wanted to pursue an opportunity with Nabavi. To accomplish this goal, Ghani falsely told Cruz there was "no money coming in, and we have big debt" to scare him into agreeing to close NDMI. Even as Ghani testified he was concerned about reimbursement rates going down and the medical imaging industry becoming less profitable, he formed a new MRI entity with Nabavi to invest in and pursue opportunities in the same industry and in the same geographic area. Based on the contradictory evidence, the jury could have disregarded Ghani's explanation in favor of the one provided by Cruz.

This is some evidence Ghani placed his own interests before the interests of NDMI, used the advantage of his position to gain a benefit for himself at the expense of NDMI, or placed himself in a position where his self-interest might conflict with his obligations to NDMI. Thus, we conclude there is some evidence to support the jury's answer to Question 1 that Ghani failed to comply with his fiduciary duties to NDMI.

Additionally, Hakala's testimony is sufficient to support the jury's answer to Question 3 awarding $2.075 million for Ghani's breach. Hakala testified that the equity value of NDMI at the end of 2008 was about $2.95 million. Hakala provided a step-by-step process explaining his methodology to the jury. He stated buyers of medical imaging businesses were paying between three and six times EBITDA. He explained why, for NDMI, he used a lower multiplier, which

included some of the concerns raised by Ghani. However, Hakala also explained to the jury how to reach its own calculation if it believed his numbers were too low or high. He testified: "So it's simply multiplication. You have an earnings number, a multiplier to apply the earnings. That gives you the value of the business." From that, the jurors could subtract the debt to find the net equity value of the business, meaning what the business is worth to the partners.

The jury's damages award is approximately three times EBITDA, which is within the range of the evidence presented at trial. *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc*., 402 S.W.3d 257, 265 (Tex. App.—Dallas 2013, pet. denied) (jury has discretion to award damages within range of evidence presented at trial so long as there is a rational basis for calculation). We conclude there is some evidence to support the jury's answer to Question 3.

In response to Question 2, the jury determined Ghani's failure to comply with his fiduciary duties to NDMI was not excused. The charge instructed the jury that failure to comply is excused if Cruz waived compliance. The charge defined waiver as the "intentional surrender of a known right or intentional conduct inconsistent with claiming it." Although Cruz consented to closing NDMI, Cruz testified he relied on Ghani's representations there was "no money coming in, and we have big debt," which "came out to be not true." Cruz stated: "[B]asically, if I would have known the financial status of the North Dallas Medical Imaging, which was shut down from Mr. Ghani explaining to me that there was no money in 2008," he would not have agreed to dissolution. Cruz also testified he did not know about Mesquite AMI or that this potential venture was a reason Ghani sought to close NDMI.

From this evidence, the jury could have concluded that, although Cruz consented to closing NDMI, he did not intentionally surrender a known right. He relied on false information from Ghani, at the same time Ghani withheld accurate financial information, and he would not have

–22–

consented had he known NDMI was profitable.  The evidence does not conclusively establish Cruz intentionally surrendered a known right.

### 4. *Conclusion*

Because more than a scintilla of competent evidence supports the jury's answers to Questions 1, 2, and 3, we conclude the trial court erred by disregarding the jury's answers and entering JNOV in Ghani's favor on these questions.  Additionally, the jury's answers to these questions are not against the great weight and preponderance of the evidence.  We sustain Cruz's first issue to this extent and we overrule Ghani's first, second, and third cross-issues.

## C. Plano Open Claim

In his first issue, Cruz argues, in part, the trial court erred by granting Ghani's motion for JNOV on his Plano Open claim.  In his fourth through seventh cross-issues, Ghani asserts the jury's answers to Questions 4A, 4B, 5A, and 5B are against the great weight and preponderance of the evidence.  Ghani's eighth, ninth, and nineteenth cross-issues state the evidence is insufficient to support the jury's answers to Questions 6A, 6B, and 22.

### 1. *Jury Charge, Jury's Findings, and JNOV*

Question 4A asked the jury whether Ghani failed to comply with his fiduciary duties, if any, owed to Plano AMI with respect to the pursuit of Plano Open.  The charge stated that, as the general partner of Plano AMI, GMI owed fiduciary duties to Plano AMI, and, to the extent Ghani exercised a degree of control over GMI such that he directed GMI's conduct as a general partner regarding the pursuit of Plano Open, Ghani "also owed the fiduciary duties."  The charge quoted paragraphs 6.1(a) and (f) of the Plano AMI Limited Partnership Agreement ("Plano AMI Agreement"), which are discussed below.

To prove he complied with his fiduciary duties to Plano AMI, Question 4A required Ghani to show that:

a. the transactions were fair and equitable to Plano AMI;
b. Ghani made reasonable use of the confidence that Plano AMI placed in him;
c. Ghani acted in the utmost good faith and exercised the most scrupulous honesty toward Plano AMI;
d. Ghani did not place his own interests before the interests of Plano AMI, did not use the advantage of his position to gain a benefit for himself at the expense of Plano AMI, and did not place himself in any position where his self-interest might conflict with his obligations to Plano AMI; and,
e. Ghani fully and fairly disclosed all important information to Plano AMI.

The jury answered "No," meaning Ghani did not comply.

In Question 4B, the jury concluded that failure to comply was not excused. The jury was instructed that the failure to comply was excused if compliance was waived by Plano AMI. Question 5A asked the jury whether Ghani complied with his fiduciary duties to GMI with respect to the pursuit of Plano Open. To prove he complied with his fiduciary duties to GMI, Question 5A required Ghani to show that:

a. the transactions were fair and equitable to GMI;
b. Ghani made reasonable use of the confidence that GMI placed in him;
c. Ghani acted in the utmost good faith and exercised the most scrupulous honesty toward GMI;
d. Ghani did not place his own interests before the interests of GMI, did not use the advantage of his position to gain a benefit for himself at the expense of GMI, and did not place himself in any position where his self-interest might conflict with his obligations to GMI; and,
e. Ghani fully and fairly disclosed all important information to GMI.

The jury answered "No," meaning Ghani did not comply. In response to Question 5B, the jury found the failure to comply was not excused.

In Questions 6A and 6B, the jury was asked what sum of money would compensate appellants for the damages caused by the breaches of fiduciary duty found in response to Questions 4A and 5A. The jury provided the same response to both Questions 6A and 6B: $1.657 million. Finally, in response to Question 22, the jury found by clear and convincing evidence that the injuries found in response to Question 6 resulted from malice or fraud by Ghani.

–24–

Ghani moved for JNOV on the grounds the jury's answers to Question 4A, 4B, 5A, and 5B should be disregarded because the issues were established as a matter of law by the undisputed evidence. He asserts there is no evidence to support the jury's answers to Questions 6A, 6B, and 22. Ghani's motion for JNOV does not challenge that he owed a fiduciary duty to Plano AMI and GMI. The trial court granted Ghani's motion for JNOV as to these findings.

2. *Fiduciary Duties Owed to Plano AMI*

Cruz asserts Ghani breached his fiduciary duties to Plano AMI and GMI by pursuing Plano Open. Ghani maintains the Plano AMI Agreement expressly permitted him to open and operate Plano Open. Paragraph 6.1 of the Plano AMI Agreement includes the following two provisions:

> (a) *Management.* . . . [T]he General Partner shall have the full power and authority, except as otherwise expressly provided in this Agreement, to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate. . . .

> (f)     *Outside Activities and Conflicts of Interest.* The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any affiliate thereof.

Ghani asserts paragraph 6.1(f) expressly permitted any of the partners, officers, directors, or employees to open competing businesses. Therefore, Ghani argues, this paragraph expressly allowed him to pursue Plano Open, a competing business. Cruz disagrees paragraph 6.1(f) gave Ghani such authority because Ghani owed fiduciary duties to Plano AMI and GMI.

Chapter 153 of the Texas Business Organizations Code governs limited partnerships. Section 153.152 is titled "General Powers and Liabilities of General Partner" and states in part:

Except as provided by this chapter, the other limited partnership provisions, *or a partnership agreement*, a general partner of a limited partnership: (1) has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners; and (2) has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners.

TEX. BUS. ORGS. CODE ANN. § 153.152(a) (emphasis added). While chapter 153 does not directly address the extent to which duties and liabilities of general partners in a limited partnership may be altered by agreement, the italicized language indicates a limited partnership agreement may modify the liabilities of a general partner.

Section 153.003 states that "in the case not provided for by this chapter and the other limited partnership provisions, the provisions of Chapter 152 governing partnerships that are not limited partnerships and the rules of law and equity govern." *Id.* § 153.003; *see also Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 547 (Tex. 2016). With exceptions, a "partnership agreement governs the relations of the partners and between the partners and the partnership." TEX. BUS. ORGS. CODE ANN. § 152.002(a). The partnership agreement may not eliminate the duty of loyalty, duty of care, and obligation of good faith. *Id.* § 152.002(b)(2)-(4). However, by agreement, the partners "may identify specific types of activities or categories of activities that do not violate the duty of loyalty if the types or categories are not manifestly unreasonable." *Id.* § 152.002(b)(2). A partner's duty of loyalty includes refraining from competing or dealing with the partnership in a manner adverse to the partnership. *Id.* § 152.205(3).

Additionally, Texas has a strong policy favoring freedom of contract. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 877 (Tex. 2018) (quoting *Phila. Indemnity Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." *Id.* (quoting *Phila. Indemnity Ins. Co.*, 490 S.W.3d at 471). Generally parties may contract as they wish so long as their agreement "does not violate positive law or offend public policy." *Id.* (quoting *Phila. Indemnity*

*Ins. Co.*, 490 S.W.3d at 475). "In certain contexts where the Legislature sets certain rights and obligations between parties, it has explicitly allowed parties to contract around those rights to a certain extent." *Id.* (citing TEX. BUS. ORGS. CODE § 152.002 (detailing the rights and duties a partnership agreement can and cannot waive); TEX. PROP. CODE § 92.061). Courts honor the contractual terms parties use to define the scope of their obligations and agreements, including limiting fiduciary duties that might otherwise exist. *See Strebel v. Wimberly*, 371 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins*. Co., 235 S.W.3d 695, 703 (Tex.2007)); *see also Harrison v. Harrison Interests, Ltd.*, No. 14-15-00348-CV, 2017 WL 830504, at *4 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied) ("we must balance the principle that fiduciary duties arise as a matter of law with our obligation to honor the contractual terms that parties use to define the scope of their obligations and agreements, including limiting fiduciary duties that might otherwise exist.").

Here, paragraph 6.1(f) of the Plano AMI Agreement expressly permitted GMI or any of its directors, officers, employees, agents, or representatives to "engage in business activities in addition to those relating to the Partnership, including business interests and activities in direct competition with the Partnership." Through paragraph 6.1(f), the Plano AMI Agreement identified a specific type of activity or category of activities that do not violate the duty of loyalty. *See* TEX. BUS. ORGS. CODE ANN. § 152.002(b)(2). Cruz does not argue the type of activity or category of activities identified in paragraph 6.1(f) are manifestly unreasonable. *See id.* We will honor the contractual terms the parties used to define the scope of their obligations and agreements, including limiting fiduciary duties that might otherwise exist. *See Strebel*, 371 S.W.3d at 284 (citing *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 703).

Ghani, an officer or director of GMI, pursued Plano Open, which was a business interest in direct competition with Plano AMI. The parties, through the Plano AMI Agreement, expressly

allowed Ghani to engage in a business in direct competition with Plano AMI. Because Ghani's actions about which Cruz complains were expressly permitted by the Plano AMI Agreement, we conclude the express limitation of fiduciary duties in the Plano AMI Agreement forecloses Cruz's Plano Open claim. Therefore, we conclude the trial court did not err by granting Ghani's motion for JNOV on Question 4A.

### 3. Fiduciary Duties Owed to GMI

In its response to Question 5A, the jury found Ghani failed to comply with his fiduciary duties owed to GMI with respect to the pursuit of Plano Open. Cruz argues Ghani breached his fiduciary duty to GMI by creating GMI #2 and usurping the Plano Open opportunity from GMI.

The jury was instructed that as an officer or director of GMI, Ghani owed fiduciary duties to GMI. The charge required Ghani to establish he, among other things, made reasonable use of the confidence GMI placed in him, acted in the utmost good faith and exercised the most scrupulous honesty toward GMI, did not place his own interests before those of GMI, and did not place himself in any position where his self-interest might conflict with his obligations to GMI in order to show he complied with his fiduciary duties to GMI. The jury found he did not, and there is some evidence to support that conclusion.

Cruz, Ghani, and Taba discussed acquiring an open MRI machine to create an additional revenue stream for Plano AMI. Although the parties would have needed to lease additional space to add another machine, some evidence shows the open MRI could have been added to the existing business. Instead of pursuing the open MRI opportunity through GMI, Ghani and Taba created a new entity, GMI #2. For Ghani and Taba, because the open MRI machine was not expensive and margins were high, the venture was profitable. This is some evidence Ghani placed his own interests before the interests of GMI or placed himself in a position where his self-interest might

–28–

conflict with his obligations to GMI. Thus, we conclude there is some evidence to support the jury's answer to Question 5A that Ghani failed to comply with his fiduciary duties to GMI.[3]

In response to Question 5B, the jury concluded the failure was not excused. The jury was instructed that the "[f]ailure to comply is excused if compliance is waived by Cruz." The evidence does not show Cruz waived compliance, that he intentionally surrendered a known right or intentionally engaged in conduct inconsistent with claiming it. Rather, there is some evidence Cruz was interested in adding an open MRI machine to Plano AMI. Ghani, Taba, and Cruz discussed adding an open MRI machine several times because they considered it a potential additional revenue stream. Cruz testified he never stated he was against the idea of an open MRI machine or would veto it. Instead, he explained, Ghani and Taba took the open MRI opportunity from him. Taken together, this is some evidence Cruz did not waive Ghani's compliance with his fiduciary duties and there is some evidence to support the jury's answer to Question 5B.

Question 6B asked the jury what sum of money would fairly and reasonably compensate Cruz for the damages proximately caused by the breach of fiduciary duty found in response to Question 5A. The jury was instructed to consider the following elements of damages and none other: "The fair market value of Plano Open as of December 31, 2011, plus the total distributions that Ghani and Taba had received from Plano Open before that date." The jury answered: $1.657 million.

Hakala testified the value of Plano Open at the end of 2011 was between $1.4 million and $1.75 million. The jury's damages award is within the range of the evidence presented at trial. *See Basic Capital Mgmt.*, 402 S.W.3d at 265 We conclude there is some evidence to support the jury's answer to Question 6B.

---

[3] We do not conclude Ghani was required to use GMI as the general partner for the new open MRI entity as a matter of law. We only conclude that, in light of the jury charge as given, Ghani did not show he complied with his fiduciary obligations to GMI.

In Question 22, the jury was asked: "Do you find by clear and convincing evidence that the injuries, if any, you found in response to Question 6 resulted from malice or fraud by" Ghani? The jury answered "Yes." Question 22 was part of the jury's determination of punitive damages. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994) (punitive damages are damages assessed to punish a defendant for outrageous, malicious, or otherwise morally culpable conduct). When reviewing the legal sufficiency of the evidence to support a finding that must be proven by clear and convincing evidence, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 866 (Tex. 2017). We assume the finder of fact resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.*

The evidence shows Ghani pursued Plano Open after consulting with legal counsel who informed Ghani he could pursue the opportunity based on paragraph 6.1(f) of the Plano AMI Agreement. Additionally, Taba testified that by the time Plano Open was established, neither Cruz nor Ghani wanted to pursue new businesses together. Although Cruz testified he wanted to add an open MRI machine to the services offered by Plano AMI in 2007 or 2008, that was before his relationship with Ghani became acrimonious. Reviewing the evidence under the applicable standard of review, we conclude there is not clear and convincing evidence that the injuries resulted from malice or fraud by Ghani.

*4.  Conclusion*

We conclude the trial court did not err by granting Ghani's motion for JNOV on the jury's answers to Questions 4A and 22.  We overrule Cruz's first issue to this extent and we sustain Ghani's fourth and nineteenth cross-issues.  Because the jury should not have considered whether Ghani's failure to comply with his fiduciary duty to Plano AMI was excused (Question 4B) or what amount of damages would compensate for his failure to comply (Question 6A), we do not consider Cruz's first issue to this extent or Ghani's fifth and eight cross-issues.

Because the evidence is sufficient to support the jury's answers to Questions 5A, 5B, and 6B, we conclude the trial court erred by disregarding the jury's answers to and entering JNOV in Ghani's favor on these questions.  We sustain Cruz's first issue to this extent and we overrule Ghani's sixth, seventh, and ninth cross-issues.

**D.  Plano AMI & GMI Claims**

In his first issue, Cruz argues, in part, the trial court erred by entering JNOV in Ghani's favor on his Plano AMI and GMI claims.  In his tenth through sixteenth cross-issues, Ghani argues the evidence is insufficient to support the jury's answers to Question 7, 8, 9A, 9B, 10, and 12, and the jury's answer to Question 11 is against the great weight and preponderance of the evidence.

*1.  Plano AMI Claim: Jury Charge, Jury's Findings, and JNOV*

Question 7 asked the jury whether Ghani actively directed or participated in GMI's conversion of the GMI shares belonging to Cruz.  The jury answered "Yes."  In response to Question 8, the jury determined $8,000 would compensate Cruz for his damages proximately caused by the conversion.  Questions 9A and 9B asked the jury whether there was an agreement that Cruz would be a limited partner in Plano AMI and, if so, what percentage interest he owned.  The jury concluded Cruz possessed a 24% limited partnership interest in Plano AMI as of August 2010.  Question 10 asked the jury whether Ghani actively directed or participated in GMI's

conversion of Cruz's limited partnership interest in Plano AMI and the jury answered "Yes." Question 11 asked the jury whether Ghani complied with his fiduciary duties to Cruz with respect to treatment of Cruz as a limited partner in Plano AMI after August 11, 2010. The jury answered "No," meaning Ghani failed to comply with his fiduciary duties. In response to Question 12, the jury determined $617,000 would compensate Cruz for his damages proximately caused by the conduct found in response to Question 10 or 11. Ghani's motion for JNOV asserted there is no evidence to support the jury's answers to Questions 7, 8, 9A, 9B, and 10, and the jury's answer to Question 11 should be disregarded because the issue was established as a matter of law.

2. *Plano AMI Claim: Background Facts & Analysis*

The parties disputed the ownership structure of GMI and Plano AMI. Cruz maintained he was a limited partner in Plano AMI and held stock in GMI while Ghani asserted Cruz only owned stock in GMI. Some evidence shows Cruz was a limited partner in Plano AMI, owned stock in GMI, and Ghani directed or participated in the conversion of both interests.

### a. Cruz Owned a Limited Partnership Interest in Plano AMI

Cruz testified he was a limited partner in Plano AMI. Cruz claimed he, Ghani, and Taba each owned a 24% limited partnership interest directly in Plano AMI; GMI owned 1% as the corporate general partner; and physician investors owned the remainder. The Plano AMI limited partnership agreement lists GMI as the general partner and Ghani, Taba, and Cruz as limited partners. Ghani signed the Plano AMI Agreement as president of GMI and individually as a limited partner. Taba and Cruz each signed individually as limited partners. Exhibit A to the Plano AMI Agreement is titled "List of Partners and Percentage Interest." It lists GMI as the general partner owning a 60% interest. Ghani is listed as a limited partner, but no percentage interest is given. Taba and Cruz are not listed on Exhibit A. Likewise, Exhibit B titled "Description of Property Contributed by the Partners" lists GMI as the general partner, but does

not provide the amount of property GMI contributed. Ghani, individually, is listed as a limited partner, but, again, no amount of property is provided. Taba and Cruz are not listed on Exhibit B. From 2004 to 2010, Plano AMI made distributions directly to Cruz and Taba, but they did not receive distributions from GMI. The tax returns for those six years, which Ghani signed, show Cruz was a limited partner in Plano AMI.

In contrast, Ghani asserted GMI owned 60% of Plano AMI and physician investors owned the remaining 40%. Cruz, Ghani, and Taba each owned one-third of the GMI stock, but were not limited partners in Plano AMI. According to Ghani, Cruz and Taba preferred this structure because holding their ownership interests through GMI concealed their large interests from physician investors. Cruz was particularly concerned because he would be referring fewer patients to Plano AMI than he did to NDMI.

Ghani explained Doug Brady, a lawyer hired by Plano AMI, discovered in 2010 that the tax returns filed for Plano AMI incorrectly showed Cruz and Taba were limited partners in Plano AMI. Brady instructed Zamanian to file amended tax returns for 2004 through 2010, and the amended returns only changed the designations reflecting which people were shareholders in GMI and limited partners in Plano AMI. The amended tax returns show Cruz was a shareholder in GMI rather than a limited partner in Plano AMI. Ghani explained the error in the tax return occurred because Zamanian assumed the corporate structure for GMI and Plano AMI mirrored the structure of MCG and NDMI when it did not.

Although Ghani asserts the documents showing Cruz was a limited partner in Plano AMI were inaccurate and reflect a series of mistakes, the jury was free to disbelieve this testimony and instead credit the substantial contradicting evidence. Documentary evidence and Cruz's testimony constitute more than a scintilla of competent evidence to support the jury's answers to Questions

9A and 9B, in which it concluded there was an agreement for Cruz to be a limited partner in Plano AMI and he owned a 24% interest as of August 2010.

### b. Conversion of Cruz's Plano AMI Limited Partnership Interest

It is uncontested that Ghani was president of GMI and exercised full control over Plano AMI. By the summer of 2010, there was conflict between Ghani and Cruz and they no longer wanted to be business partners. Over the next eighteen months, Ghani dissolved NDMI after inducing Cruz's consent by withholding financial information and misrepresenting the status of the business. Additionally, Ghani started Plano Open, which siphoned customers from Plano AMI. Two former employees claimed Ghani and his wife, Rona,[4] were looking for a way to exclude Cruz from the partnerships. One former employee testified she heard Rona talk about their plans to "get [Cruz] out of the business." When asked about her understanding of the plan, the former employee responded: "[T]hey were just going to get him out of the partnership. How that was going to take place, I don't know." The other former employee testified she knew the Ghanis were unhappy with Cruz and wanted him out of the business. Rona expressed her displeasure that Cruz "wasn't carrying his weight, he wasn't bringing enough business, and [Rona] didn't feel that he earned or deserved to have any part of the [distribution] checks or any of the money of the shareholders."

At a meeting in June 2010, Ghani was angry with Cruz. According to Cruz, Ghani threatened him, saying: "Dr. Cruz, you are a traitor. You're a traitor, and I'm going to hire my attorneys. I'm going to destroy you, and I'm going to take your license away." After this meeting, Ghani and Taba consulted Brady about removing Cruz.

In July 2010, after Cruz sued Ghani, Ghani realized the Plano AMI tax returns erroneously showed Cruz was a limited partner and no dividends had been declared from GMI. Ghani

---

[4] Because Rona Ghani has the same surname as her husband who is a party to this appeal, we will call her by her first name.

instructed Zamanian to amend the tax returns and he began recognizing dividends for GMI. Once the tax returns were amended, they showed Cruz owned his interest only in GMI. Cruz no longer held any interest in Plano AMI.

Taken together, there is some evidence showing Ghani actively directed or participated in GMI's conversion of Cruz's limited partnership interest in Plano AMI. Because there is sufficient evidence to support the jury's answer to Question 10 and it was instructed to consider damages based on its answer to Question 10 or Question 11, we need not consider the evidence supporting the jury's response to Question 11. *See* TEX. R. APP. P. 47.1.

### c. Damages for conversion of Plano AMI Interest

The jury concluded $617,000 would compensate Cruz for his damages proximately caused by the conversion of his interest in Plano AMI. Ghani's motion for JNOV asserted there is no evidence to support this amount.

Hakala performed a similar valuation for Plano AMI as he did for NDMI and used a similar exhibit during his testimony.

#### Summary of Plano AMI L.P. Tax Returns Financial Statements and Adjustments

|  | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $ 2,185,739 | $ 2,746,895 | $ 2,507,464 | $ 1,833,590 | $ 1,791,854 | $ 1,053,370 | $ 11,354 |
| Gross Profits | $ 1,501,971 | $ 2,222,860 | $ 1,972,551 | $ 1,291,235 | $ 1,217,194 | $ 748,945 | $ 11,354 |
| Other Income |  |  |  | $ 96,580 | $ 33,202 | $ 1,346 | $ - |
| Expenses | $ 1,017,210 | $ 1,070,078 | $ 979,184 | $ 865,248 | $ 916,316 | $ 677,056 | $ 124,202 |
| Taxable Income | $ 484,761 | $ 1,152,782 | $ 993,367 | $ 522,567 | $ 334,080 | $ 73,235 | $ (112,848) |
| EBIT | $ 497,476 | $ 1,164,108 | $ 1,013,785 | $ 536,185 | $ 351,378 | $ 125,211 | $ (106,338) |
| EBITDA | $ 667,054 | $ 1,322,855 | $ 1,203,162 | $ 797,525 | $ 715,907 | $ 350,961 | $ (92,623) |

Plano AMI's revenue and profitability steadily increased in 2008 and 2009. Hakala used the adjusted EBITDA for Plano AMI and, based on the offers from potential buyers, multiplied it by four. A high-end multiplier of five would reflect Plano, Texas, as a "premium area" with a good

growth trend. The product would be between about $6 million and $7.5 million. He testified the net equity value was between $5.65 million and $7.15 million.

However, by August 2010, the EBITDA "had been reduced substantially." Hakala testified "some of the referrals went down and there was a clinic opened really close by called Plano Open AMI that began to draw revenue off and also incur expenses." He used a lower multiplier of 3.5 and 4.0 because "they were now facing direct competition nearby, and they had suffered a significant decline in revenue, so a buyer would be concerned about that." He estimated the value was between $2.8 million and $3.2 million. He concluded the net equity was $2.275 million to $2.675 million. Cruz was a 24% limited partner, meaning his share was worth $546,000 to $642,000. Ghani argues these calculations fail to account for Cruz's status as a limited partner with a minority interest.

Hakala was asked: "If you wanted to find out . . . just what Dr. Cruz's interest in Plano AMI was worth, could you take these numbers to do that calculation?" Hakala stated he could and would do so by multiplying Cruz's percentage interest by the value of his net equity. "He would get a pro rata share of his net equity." When asked why he could calculate Cruz's share in that manner, he testified:

> The discounts for lack of marketability and some of the other factors, minority interest discounts, are already built into the prices that are paid for these. So to this extent, a lot of that's already factored in.
> We are also assuming in a fair market value sense, a willing buyer, willing seller, and neither under duress. So . . . if Dr. Cruz is not in a financial position where he has to sell his interests, he doesn't really want to sell the interest, this is an awful lot of good income that's throwing off of [Plano AMI]. He's getting 30 percent of this income every year. He's getting a lot of value out of Plano AMI for his money. He wouldn't ordinarily want to or need to sell, so the question is what do I have to offer to entice him to sell to me? Because he's not openly saying, I want to sell.

Hakala's testimony shows he considered Cruz's status as a limited partner and determined, in this situation, the minority interest discount was "already built into the prices."

The jury's damages award is within the range of evidence presented at trial. *See Basic Capital Mgmt.*, 402 S.W.3d at 265. We conclude there is more than a scintilla of competent evidence to support the jury's answer to Question 12.

### d. Malice or Fraud in the Conversion of Cruz's Interest in Plano AMI

Question 23 asked, in part, whether the jury found by clear and convincing evidence the injuries it found in response to Question 12 resulted from malice or fraud by Ghani.[5] Malice is defined as "a specific intent by Ghani to cause substantial injury or harm to Cruz." Evidence shows Ghani converted Cruz's interest in Plano AMI after telling him: "Dr. Cruz, you are a traitor. You're a traitor, and I'm going to hire my attorneys. I'm going to destroy you, and I'm going to take your license away." He then had the tax returns for six years amended to show Cruz only owned an interest in GMI, thereby converting Cruz's shares in Plano AMI.

Viewing the evidence in the light most favorable to the jury's finding, a reasonable fact finder could have formed a firm belief that Ghani had a specific intent to cause substantial injury or harm to Cruz. We conclude the evidence is legally sufficient to support the jury's answer to Question 23.

### 3. Conclusion: Plano AMI Claim

Because the evidence is legally sufficient to support the jury's answers to Questions 9A, 9B, 10, 12, and 23, we conclude the trial court erred by disregarding the jury's answers to and entering JNOV in Ghani's favor on these questions. We sustain Cruz's first issue to this extent and we overrule Ghani's twelfth, thirteenth, fourteenth, sixteenth, and twentieth cross-issues. We need not consider whether the evidence is sufficient to support the jury's answers to Question 11

---

[5] Question 23 was premised on the jury's response to Question 8 or Question 12. As discussed below, we conclude no evidence supports the jury's response to Question 8. Therefore, we limit our analysis of Question 23 to Question 12.

and, thus, we do not consider Cruz's first issue to this extent or Ghani's fifteenth cross-issue. *See* TEX. R. APP. P. 44.1.

### 4. Conversion of Cruz's Shares of GMI

The jury found Ghani participated in the conversion of Cruz's shares in GMI (Question 7) and $8,000 would compensate him for the conversion (Question 8). Ghani's motion for JNOV asserted there is no evidence to support the jury's answers to Questions 7 and 8. Because we conclude there is no evidence to support the jury's answer to Question 8, the damages question, we need not consider whether the evidence supports its answer to Question 7.

It is uncontested that Cruz was removed as a shareholder from GMI and was paid nothing for his shares. The parties dispute whether Ghani and Taba were justified in removing Cruz. Assuming, as the jury found, that they were not justified, Cruz presented no evidence of his damages. Hakala testified about the value of NDMI, Plano AMI, and Plano Open. He offered no testimony about the value of GMI and, more specifically, the value of Cruz's interest in GMI. We have found no other evidence in the record that would show the value of Cruz's interest in GMI on August 11, 2010, the date provided in the jury charge. In his brief, Cruz makes no argument in support of the jury's response to Question 8. Based on our review of the record, we conclude there is no evidence supporting the jury's answer to Question 8. We overrule Cruz's first issue to this extent and sustain Ghani's eleventh cross-issue. We need not consider Ghani's tenth cross-issue asserting the evidence is insufficient to support the jury's answer to Question 7. *See* TEX. R. APP. P. 47.1.

**E. Ault Claims**

In his first issue, Cruz argues, in part, the trial court erred by entering JNOV in Ghani's favor on his claims arising from litigation filed by Kimberly Ault Robinson,[6] a former employee. In his seventeenth and eighteenth cross-issues, Ghani argues the jury's answer to Question 19 is against the great weight and preponderance of the evidence and the evidence is insufficient to support the jury's answer to Question 20.

*1. Jury Charge, Jury's Findings, and JNOV*

Question 19 asked the jury whether Ghani failed to comply with his fiduciary duties to NDMI with respect to payments made concerning the Ault litigation on behalf of Rona Ghani. The charge states that Ghani had to show:

a. the payments were fair and equitable to NDMI;
b. Ghani made reasonable use of the confidence that NDMI placed in him;
c. Ghani acted in the utmost good faith and exercised the most scrupulous honesty toward NDMI;
d. Ghani did not place its [sic] own interests before the interests of NDMI, did not use the advantage of his position to gain a benefit for himself at the expense of NDMI, and did not place himself in any position where his self-interest might conflict with his obligations to NDMI; and,
e. Ghani fully and fairly disclosed all important information to NDMI.

The jury answered "No," meaning Ghani did not comply with his fiduciary duties and, in response to Question 20, determined the amount of $95,000 would compensate NDMI for its damages.

*2. Background Facts*

Rona Ghani worked as the marketing director for NDMI and Plano AMI. Ault was hired to work with Rona and she worked for NDMI for approximately 90 days in 2008. After leaving NDMI, Ault sued Rona and NDMI alleging Rona forged her name on a non-compete agreement and sent the forged document to her new employer, causing her new employment to be terminated.

---

[6] At the time Kimberly Ault Robinson filed her lawsuit, she was known as Kimberly Ault. At the time of trial in this matter, her name was Kimberly Ault Robinson. Because all parties refer to the underlying litigation as the Ault claims or Ault litigation, we will do so as well and, for purposes of this analysis, we will refer to Kimberly Ault Robinson as "Ault."

NDMI paid legal fees on behalf of Rona and itself to defend the lawsuit and paid to settle the lawsuit. NDMI did not seek indemnification from Rona.

Cruz testified Ghani did not inform him about the Ault litigation and he did not participate in the decision to pay expenses related to the litigation or settlement. Ghani testified he did inform Cruz who replied: "I want you to handle it. I don't have time." Taba testified Ghani told him that Rona contacted all of the NDMI partners and told them NDMI was paying the defense costs.

### 3. Law & Analysis

Cruz argues Ghani breached his fiduciary duties by not causing NDMI to seek indemnification from Rona. Under Texas law, the availability of common law indemnity is extremely limited. *Mahrouq Enterprises Intern. (MEI), Inc. v. Griffin*, No. 05-10-00071-CV, 2012 WL 1537460, at *4 (Tex. App.—Dallas May 1, 2012, no pet.) (mem. op.) (citing *Affordable Power, L.P. v. Buckeye Ventures, Inc.*, 347 S.W.3d 825, 833 (Tex. App.—Dallas 2011, no pet.)). Common law indemnity survives in Texas only in products liability actions to protect an innocent retailer in the chain of distribution and in negligence actions to protect a defendant whose liability is purely vicarious in nature. *Id.* (citing *Affordable Power,* 347 S.W.3d at 833). Vicarious liability is liability placed upon one party for the conduct of another, based solely upon the relationship between the two. *Id.* (citing *Affordable Power,* 347 S.W.3d at 833). In a case in which one defendant's liability is premised solely on respondeat superior, that defendant's liability is purely vicarious, and a claim for common law indemnity exists. *Id.* (citing *Affordable Power,* 347 S.W.3d at 833). There is no right of indemnity against a defendant who is not liable to the plaintiff. *Id.* (citing *Affordable Power,* 347 S.W.3d at 833).

When a party seeking indemnity, as Cruz argues NDMI should have, settles the claim of the potential indemnitor (Rona) without a judicial determination of the indemnitor's liability to the plaintiff (Ault), the party "must satisfy three elements in order to be entitled to indemnity: 1) that

it was potentially liable to the plaintiffs; 2) that the settlement was made in good faith; and 3) that the settlement was a reasonable amount under the circumstances." *Id.* at \*5 (citing *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 179–80 (Tex. App.—Amarillo 1997, writ denied)). Upon such a showing, the indemnitee may recover the amount paid in settlement of the claim. *Id.* (citing *St. Anthony's Hosp.*, 946 S.W.2d at 179–80).

There was no judicial determination of Rona's liability to Ault. There is no evidence that in this record showing NDMI could have met the three elements listed above that are required to be entitled to indemnity. *See id.* at \*4. Even if we assume NDMI was potentially liable to Ault, there is no evidence the settlement was made in good faith or the amount of the settlement was reasonable.

Because we conclude there is no evidence NDMI was entitled to indemnification against Rona, we also conclude there is no evidence Ghani breached his fiduciary duty by not seeking that indemnification. Additionally, the jury's finding that Ghani breached his fiduciary duty by not seeking indemnification from Rona is against the great weight and preponderance of the evidence.

To the extent Cruz argues in his brief that the trial court erred by excluding evidence concerning Ault's allegations of forgery, Cruz provides no explanation of how the trial court's decision was an abuse of discretion, *see In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005), or caused reversible error, *see* TEX. R. APP. P. 44.1(a). Having reviewed Cruz's offer of proof of the evidence excluded by the trial court, we cannot conclude the trial court abused its discretion or the exclusion of evidence resulted in reversible error.

### 4. Conclusion

We conclude the trial court did not err by granting Ghani's motion for JNOV on the jury's answers to Questions 19 and 20. We overrule Cruz's first issue to this extent. We sustain Ghani's

seventeenth cross-issue and we need not consider his eighteenth cross-issue challenging the damages awarded by the jury based on its finding of breach of fiduciary duty.

## F. Salary Claims

In his second issue, Cruz argues the trial court erred by refusing to enter judgment on his claim that Ghani improperly paid a salary to himself.

### 1. Background Facts

Ghani believed he should be compensated for managing the businesses because he performed the same functions as a management company, which would be paid for its services. Cruz opposed paying Ghani because he believed the partners were compensated through distributions.

The NDMI partnership agreement precludes the general partner from receiving compensation for services rendered on behalf of the partnership. However, the Plano AMI partnership agreement permits the general partner to receive compensation. Ghani wrote a letter dated November 1, 2007, to Taba and himself, stating GMI, the general partner of Plano AMI and manager of its business affairs, would begin paying compensation to Ghani and Taba. Ghani would receive $8,000 per month for acting as GMI's president and overseeing the day-to-day affairs of Plano AMI on behalf of GMI. Taba would receive $2,500 per month for providing contrast services for patients. The minutes of the annual meeting of the GMI board of directors reflect Ghani, Taba, and Cruz were present at a meeting held on November 15, 2007. Cruz disputed he was present and Taba's testimony indicates Cruz may not have been. The meeting minutes state: "IT IS FURTHER RESOLVED, that the compensation agreement entered into by the officers of the Corporation on or about November 1, 2007, a copy of which is attached hereto, is hereby adopted, approved and ratified by the Board of Directors of the Corporation." The

minutes are signed by Taba as the secretary and Ghani as the chairman. Taba testified the November 1, 2007 letter may have been created after September 1, 2008.

From December 2008 through April 2010, Plano AMI paid $8,000 per month to MG International. The record shows MG stands for Mike Ghani. Ghani told Taba that the salary was less than a management company would be paid and Taba did not consider the salary unfair.

### 2. Jury's Findings

The jury found Ghani failed to comply with his fiduciary duties to Plano AMI with respect to the payments made to himself (Question 13), but awarded $0 in damages (Question 14). Ghani did not move for JNOV on the liability question and, thus, has not challenged the finding he breached his fiduciary duties by making payments to himself. The trial court did not award damages to Cruz on this claim. On appeal, Cruz argues the trial court should have entered judgment ordering disgorgement of Ghani's compensation.

### 3. Law & Analysis

Courts may fashion equitable remedies such as disgorgement and forfeiture to remedy a breach of a fiduciary duty. *Cooper v. Campbell*, No. 05-15-00340-CV, 2016 WL 4487924, at *10 (Tex. App.—Dallas Aug. 24, 2016, no pet.) (mem. op.) (citing *ERI Consulting Eng'r, Inc. v. Swinnea*, 318 S.W.3d 867, 874, 873-75 (Tex. 2010); *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999); *Dernick Resources, Inc. v. Wilstein*, 471 S.W.3d 468, 482 (Tex. App.—Houston [1st Dist.] 2015, pet. denied)). Disgorgement is an equitable forfeiture of benefits wrongfully obtained. *Id.* (citing *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (orig. proceeding); *Swinnea v. ERI Consulting Eng'r, Inc.*, 481 S.W.3d 747, 752 (Tex. App.—Tyler 2016, no pet.)). A party may be required to forfeit benefits when a person rendering services to another in a relationship of trust breaches that trust. *See In re Longview Energy Co.*, 464 S.W.3d 361.

"We have said that such equitable forfeiture 'is not mainly compensatory . . . nor is it mainly punitive' and 'cannot . . . be measured by . . . actual damages.'" *Id.* (quoting *Burrow*, 997 S.W.2d at 240). Disgorgement is compensatory in the same sense attorney fees, interest, and costs are, but it is not damages. *Id.* As a result, equitable forfeiture is distinguishable from an award of actual damages incurred as a result of a breach of fiduciary duty. *Cooper*, 2016 WL 4487924, at *10 (citing *Burrow*, 997 S.W.2d at 240; *McCullough v. Scarbrough, Medlin & Assocs., Inc*., 435 S.W.3d 871, 905 (Tex. App.—Dallas 2014, pet. denied); *Swinnea*, 481 S.W.3d at 753). A claimant need not prove actual damages to succeed on a claim for forfeiture because they address different wrongs. *Id.* (citing *Burrow*, 997 S.W.2d at 240; *Swinnea*, 481 S.W.3d at 753). In addition to serving as a deterrent, forfeiture can serve as restitution to a principal who did not receive the benefit of the bargain due to his agent's breach of fiduciary duty. *Id.* (citing *Swinnea*, 481 S.W.3d at 753 (citing *Burrow*, 997 S.W.2d at 237–38)). However, forfeiture is not justified in every instance in which a fiduciary violates a legal duty because some violations are inadvertent or do not significantly harm the principal. *Cooper*, 2016 WL 4487924, at *10 (citing *Burrow*, 997 S.W.2d at 241; *Dernick*, 471 S.W.3d at 482; *Miller*, 142 S.W.3d at 338).

Whether a forfeiture should be imposed must be determined by the trial court based on the equity of the circumstances. *Cooper*, 2016 WL 4487924, at *10 (citing *Burrow*, 997 S.W.2d at 245; *Swinnea*, 481 S.W.3d at 753; *Dernick*, 471 S.W.3d at 482). However, certain matters may present fact issues for the jury to decide, such as whether or when the alleged misconduct occurred, the fiduciary's mental state and culpability, the value of the fiduciary's services, and the existence and amount of harm to the principal. *Id.* (citing *Dernick*, 471 S.W.3d at 482; *Miller*, 142 S.W.3d at 338). Once the factual disputes have been resolved, the trial court must determine: (1) whether the fiduciary's conduct was a "clear and serious" breach of duty to the principal; (2) whether any

monetary sum should be forfeited; and (3) if so, what the amount should be. *Id.* (citing *Swinnea*, 481 S.W.3d at 753 (citing *Burrow*, 997 S.W.2d at 245–46); *Dernick*, 471 S.W.3d at 482).

The record shows Ghani failed to comply with his fiduciary duties to Plano AMI with respect to the payments made to himself. The jury found the injury resulted from Ghani's malice (Question 24). Although Cruz, in his sixth amended petition, sought "disgorgement/fee forfeiture" for Ghani's misconduct and the issue was argued by counsel at the hearing on Ghani's motion for JNOV, the record does not show whether the trial court considered an equitable forfeiture award. Because Cruz requested the remedy and it was timely brought to the trial court's attention, we conclude the request for equitable relief should be remanded to the trial court for consideration of the factors described by the Texas Supreme Court in *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010). We sustain Cruz's second issue to this extent.

## G. Ghani's Counterclaim

In his third issue, Cruz argues the trial court denied his right to due process when it awarded judgment on Ghani's counterclaim without any adjudicatory proceeding. In 2012, Cruz obtained a judgment against Ghani for over $4 million. *See Plano AMI v. Cruz*, No. 05-12-01480-CV, 2015 WL 128592 (Tex. App.—Dallas Jan. 9, 2015, no pet.). Ghani appealed, but did not supersede the judgment. While Ghani's appeal was pending, Cruz obtained a writ of execution and caused a condominium owned by Ghani to be sold for $25,000. After the execution sale, this Court reversed the judgment on which execution issued. On remand, Ghani asserted a counterclaim for wrongful execution, which Cruz generally denied. The trial court rendered judgment that Ghani recover $217,500, the stipulated fair market value of Ghani's condominium at the time of the execution sale, on his counterclaim. The trial court also awarded Ghani prejudgment interest, post-judgment interest, and costs. *See Cruz v. Ghani,* No. 05-17-00566-CV, 2018 WL 446425, at *1 (Tex. App.—Dallas Jan. 17, 2018, no pet.).

–45–

Cruz asserts the trial court conducted no adjudication on Ghani's right to relief, either through a trial or motion for summary judgment, before entering judgment in Ghani's favor. Thus, Cruz argues, judgment on Ghani's counterclaim is improper and, by entering the judgment, the trial court denied his right to due process. Ghani responds the parties presented their legal and factual arguments on the condominium issue to the trial court.

Before trial began, Ghani's counsel informed the court there were two "administrative issues" the parties "agreed to put off until after [the] verdict. One is we have a claim for wrongful foreclosure with respect to a condominium that was foreclosed on judgment. We've agreed to just hold that and deal with that in the future." Five months after the trial concluded, the trial court held a hearing on Ghani's motion for JNOV. During the hearing, the trial court stated:

> THE COURT: Let's talk about the condominium. Defendants argue that they should be awarded judgment on the counterclaim for the levy of execution on the condominium. Help me. . . . I don't remember hearing about this during trial.
> [Counsel for Ghani]: You didn't. . . . That's the reason . . . you wouldn't remember. . . . [W]hat you may recall faintly at this point was before the trial started in one of the final pretrial conferences, [counsel for both parties] agreed to reserve the condominium issue until after the trial was over.

The parties then presented brief arguments on the condominium issue. No evidence was admitted.

Six months after the hearing, the trial court entered its final judgment which states, in part:

> By stipulation of the parties, the issues raised by defendant Ghani's counterclaim were reserved for future determination by the Court. The parties have stipulated that on February 4, 2012, a condominium located at . . . , belonging to defendant Ghani was sold at execution sale pursuant to this Court's judgment of August 7, 2012, which was later reversed on appeal, and that the fair market value of the condominium on the date of sale was $217,500. Plaintiff Cruz has deposited in the registry of the Court the $25,000 received from the execution sale. The Court concludes that defendant Ghani is entitled to restitutionary remedies to recover what was taken from him pursuant to a judgment later reversed.

Cruz filed a motion to modify the judgment or for new trial on Ghani's counterclaim.

Due process requires that a party receive "reasonable notice" of trial. *Boateng v. Trailblazer Health Enterprises, L.L.C.*, 171 S.W.3d 481, 492 (Tex. App.—Houston [14th Dist.]

–46–

2005, no pet.) (quoting *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 84 (1988)). The record shows the trial court ruled on the merits of Ghani's counterclaim without giving notice that the JNOV hearing would also be a trial on the counterclaim. Rather, the trial judge raised the issue of the counter-claim at the JNOV hearing and the parties then briefly presented arguments. There was no opportunity to present evidence. The purpose of the hearing was to determine the merits of the motion for JNOV, not to adjudicate the merits of Ghani's counterclaim. Thus, we conclude that the trial court erred by considering the JNOV hearing a trial on the merits of Ghani's counter-claim and entering judgment on the claim. *See Knutson v. Friess*, No. 09-08-00181-CV, 2009 WL 1331100, at *4 (Tex. App.—Beaumont May 14, 2009, no pet.) (citing *Mocega v. Bradford Urquhart M.D.*, 79 S.W.3d 61, 64–65 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (reversing dismissal of medical malpractice action because trial court did not give notice of hearing on motion to dismiss); *Green v. McAdams*, 857 S.W.2d 816, 819 (Tex. App.—Houston [1st Dist.] 1993, no writ) (holding trial court erred by rendering post-answer default judgment after party failed to appear at trial because trial court gave defaulting party no notice of trial setting); *Seckers v. Ocean Chems., Inc.*, 845 S.W.2d 317, 318–319 (Tex. App.—Houston [1st Dist.] 1992, no writ) (holding trial court erred in dismissing case as a discovery sanction because trial court gave no notice of sanctions hearing to the sanctioned party); *Palmer v. Cantrell*, 747 S.W.2d 39, 41 (Tex. App.—Houston [1st Dist.] 1988, no writ) (same as *Seckers*)). We sustain Cruz's third issue.

CONCLUSION

In accordance with this opinion, we affirm the trial court's judgment in favor of Ghani on Cruz's claim Ghani failed to comply with his fiduciary duty to Plano AMI by pursuing Plano Open, Cruz's GMI claim, and the Ault claim. We reverse the trial court's judgment in favor of Ghani on Cruz's claim Ghani failed to comply with his fiduciary duties to GMI by pursuing Plano Open, Cruz's NDMI claim, the Plano AMI claim, and his salary claim. We reverse the trial court's

judgment in favor of Ghani on his counterclaim. We remand for the trial court to enter judgment in favor of appellants on the NDMI claim, Plano AMI claim, salary claim, and claim Ghani failed to comply with his fiduciary duties to GMI by pursuing Plano Open; to consider Cruz's request for equitable relief on the salary claim; and to conduct further proceedings on Ghani's counterclaim.

/Craig Stoddart/
CRAIG STODDART
JUSTICE

170566HF.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ERWIN CRUZ AND THE ERWIN A. CRUZ FAMILY LIMITED PARTNERSHIP, BOTH OF THEM INDIVIDUALLY AND ON BEHALF OF NORTH DALLAS MEDICAL IMAGING, LP, PLANO AMI, LP, AND GHANI MEDICAL INVESTMENTS, INC., Appellants

On Appeal from the 101st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-10-16274.
Opinion delivered by Justice Stoddart. Justices Francis and Myers participating.

No. 05-17-00566-CV          V.

MEHRDAD GHANI, Appellee

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** that portion of the trial court's judgment in favor of appellee Mehrdad Ghani on his counterclaim.

We **REVERSE** that portion of the trial court's judgment in favor of appellee Ghani on the claims by appellants Erwin Cruz and the Erwin A. Cruz Family Limited Partnership, both of them individually and on behalf of the North Dallas Medical Imaging, L.P. ("NDMI"), Plano AMI, LP ("Plano AMI"), and Ghani Medical Investments, Inc. ("GMI") that Ghani failed to comply with his fiduciary duties to GMI by pursuing Plano Open, failed to comply with his fiduciary duties to NDMI, the failure was not excused, and NDMI suffered damages; that Cruz was a 24% limited partner of Plano AMI, Ghani actively directed or participated in GMI's conversion of Cruz's Plano AMI limited partnership interest, and Cruz suffered damages as a result; and that Ghani failed to comply with his fiduciary duties to Plano AMI with respect to salary payments made to himself.

We **AFFIRM** that portion of the trial court's judgment in favor of appellee Ghani on the claims by appellants that Ghani failed to comply with his fiduciary duties to Plano AMI by pursuing Plano Open, Ghani actively directed or participated in GMI's conversion of shares belonging to Cruz, which caused damages to Cruz; and Ghani failed to comply with his fiduciary

duties to NDMI with respect to payments made concerning the Ault Litigation on behalf of Rona Ghani.

We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 13th day of December, 2018.